**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **In re Arby's Restaurant Group, Inc. Data Security Litigation** | **Case No. 1:17-cv-514-AT** |
| **CONSOLIDATED FINANCIAL INSTITUTIONS CASE** | |

## <u>INDIVIDUAL STATEMENT REGARDING LOCAL RULE 23.1</u>

Pursuant to Local Rule 23.1, the parties met and conferred on June 9, 2017 to discuss the need for an Order prohibiting class member communications under Rule 23.1(C)(2).  Counsel cannot agree on whether an Order limiting communications should be entered and this Individual Statement reflect Plaintiffs' views as to that topic.  Plaintiffs' Counsel request a hearing to present evidence on this issue.

As an initial matter, the Court and the Rule require a "joint statement." Arby's refused, however, to agree to a joint filing so Plaintiffs were forced to file their position separately for the reasons set forth below.

Interim Lead and Liaison Counsel for Plaintiffs were on the initial Rule 23.1 call.  Mr. Meal did not participate, but his colleagues, Mssrs. Szpak and Remar, did attend on behalf of Arby's.  At that time, Plaintiffs indicated that based on their

experiences in the *Target* and *Home Depot* litigations (discussed in detail below), they believed that a narrow order restricting communications governing purported class-wide releases (as Ropes & Gray had attempted in *Target* and *Home Depot*) was appropriate. Defendant's counsel indicated that they did not believe an Order was likely appropriate, but were willing to consider anything Plaintiffs prepared and share it with their client. On Monday, June 12, Plaintiffs sent their proposed Class Communication Order to Arby's Counsel. *See* Exhibit 1, E-mail discussion between James Pizzirusso and Douglas Meal, June 12-23, 2017, at 13. After no response, on Wednesday, June 14, Plaintiffs asked Arby's Counsel when they would be able to respond. *Id.* at 12. Mr. Meal responded that "we are working on a mark-up that we expect to circulate this afternoon." *Id.* He did not circulate anything.

After a week went by with no further response, on Wednesday, June 21, Plaintiffs again inquired of Mr. Meal as to when he would circulate his "mark-up" and noted that the Parties' Joint Statement was due Friday, June 23, 2017. *Id.* at 11. Mr. Meal responded: "so sorry to be slow here -- I have been totally under water getting our brief finished and filed on Monday and then getting ready for and today presenting the argument in LabMD's 11th Circuit appeal, but now that all of that is over we'll turn our attention to the below issue and be back to you tomorrow with

our thoughts." *Id.* at 10-11.   Plaintiffs then suggested an extension might make sense:

> I understand you've been busy, but perhaps we should seek an extension of time.  I'm not really sure how we can get your proposal, meet and confer about it, and then prepare a joint statement by Friday if we're only going to get it tomorrow and we don't know what you're going to propose.  Do you all want to request an extension?

*Id.* at 10.  Mr. Meal did not respond that day so Plaintiffs' counsel began preparing their position statement in earnest Wednesday evening and Thursday morning.

On the afternoon of, Thursday, June 22, Mr. Meal responded that: "Arby's is not willing to agree to an order under Local Rule 23, as plaintiffs have presented no grounds for believing, much less have they shown, that such an order is 'necessary' within the meaning of that rule."  He further suggested that the parties file "stipulated facts" with a briefing schedule.  *Id.* at 9-10.  As Plaintiffs had already been working on their position statement for 24 hours, they opposed this approach and indicated that they were prepared to file their position with the Joint Statement.  *Id.* at 9.  Again, Mr. Meal did not immediately respond and Plaintiffs continued to work on their statement.

On Friday June 23, Mr. Meal indicated that he believed that Local Rule did not allow the Parties to submit their views in the Joint Position Statement and that the Parties should discuss a briefing schedule: "We are glad to discuss a sensible

jointly agreed proposal to be included in the report on how most efficiently to bring the issue of the need for a Rule 23.1 Order before the Court for a prompt resolution. And we of course are amenable to a short, jointly requested extension of tomorrow's deadline in order to facilitate such an (sic) discussion." *Id.* at 8-9.

Plaintiffs responded that they had a different interpretation of the Local Rule and they would likely not oppose an extension if Arby's needed to move for one.  In addition, Plaintiffs asked Arby's to confirm it would not use the Card Brand Recovery Process to attempt to settle the claims of class members and it refused to do so.  *Id.* at 8.  Mr. Meal then asked Plaintiffs to provide an advance copy of their Position Statement so that he could review it to determine whether he needed an extension.  *Id.* at 7.  Plaintiffs responded that they were not inclined to share their brief in advance as they did not believe a "joint" statement should be Plaintiffs' position with Arby's attempted refutation of it.  Plaintiffs also laid out their position again.  *Id.*

After several further emails, Mr. Meal then proposed that the Plaintiffs not submit the position statement they had been preparing for several days and instead ask the Court for a further status conference as to how to present the issue to the Court.  *Id.* at 4-5.  Plaintiffs were fine asking for a further status conference but believed they were entitled to present their position.  Mr. Meal refused to allow

3

Plaintiffs to file a Joint Statement with their "individual views as to whether an order should be entered limiting communications" (Local Rule 23.1(C)(2)) instead insisting that Plaintiffs agree to a briefing schedule. *Id.* at 3-4. As Plaintiffs replied:

> Perhaps you could point us to the language in the rule that contemplates any briefing beyond a Joint Statement. We haven't seen any and we certainly see no language suggesting we file a brief and then you respond. The Rule mentions three things: (1) a Joint Statement; (2) collective or individual views (assuming there's no agreement) as to 'whether an order should be entered'; and (3) a request for a hearing or stipulated facts. If you believe the parties should brief the issue instead of having the Court decide it on the basis of the Joint Statement (or argue that you want more time to respond to our position), you are certainly free to make that argument in your position. The Court can then let us know what it wants to do.

*Id.* at 1. As such, given the importance of this issue and continued prejudice that may result should this issue not be resolved by the Court, Plaintiffs have been forced to file this Statement not as a "joint" statement, but an individual one.

It appears that Arby's never prepared its own statement, nor should it be allowed to do so now given its unwillingness to comply with the Local Rules in a timely manner. If Arby's is allowed to respond directly to this statement (instead of providing a simultaneous statement as the Rules contemplated), then Plaintiffs would request an opportunity to reply, as well. Plaintiffs' position is laid out further below.

4

**PLAINTIFFS' POSITION:**

Arby's suggests that an order with respect to class member communications is unnecessary, that it should be authorized to communicate freely with absent class members about this class action, and that it should be allowed to discourage class member involvement in this litigation without oversight by Class Counsel or the Court.  Plaintiffs disagree.

Given the history of what has occurred in cases substantially similar to this one (where Ropes & Gray represented the defendants) and Arby's refusal to agree it will not pursue the same strategy here, Plaintiffs believe that a limited order governing communications with absent class members is appropriate for several reasons.  *First,* it appears that Arby's—acting in conjunction with or through Visa and MasterCard (commonly referred to as "the Card Brands")—will likely seek to preclude class members from participating in this case by attempting a misleading class-wide settlement ***and release*** of the class claims in this case under the guise that the settlement is part of the so-called Card Brand Recovery Processes ("Recovery Processes"),[1] as its lead lawyer has attempted to do in representing other merchants

---

[1] The Financial Institution Plaintiffs ("FI Plaintiffs" or "Plaintiffs"), and the members of the classes they seek to represent, issue payment cards to their customers.  Most of these cards utilize the Visa or MasterCard networks (the "Card

in analogous data breaches and related lawsuits (*e.g.*, in the *In re Target Corp. Customer Data Security Litigation*, 0:14-md-2522 (D. Minn.) ("*Target Data Breach Litigation*" or "*Target*") and *In re The Home Depot, Inc. Customer Data Breach Litig.*, 1:14-md-2583 (N.D. Ga.) ("*Home Depot Data Breach Litig.*" or "*Home Depot*") litigation, both defendants were represented by Ropes & Gray and Doug Meal (Arby's lead counsel here)[2], and they attempted a similar end-run around Rule

_____

Networks") to facilitate financial transactions.  The Card Networks issue Card Operating Regulations that delineate certain rights and responsibilities among the various parties who use the Card Networks, including merchants (such as Arby's) and card-issuing financial institutions (such as the FI Plaintiffs).  Both Visa's and MasterCard's respective Card Operating Regulations include Recovery Processes which may provide limited compensation in the event of a data compromise involving payment card information.  Through these Recovery Processes, it is possible (but by no means required), that the Card Network may assess some financial liability on an entity deemed responsible for a data breach.  Sums recovered by the Card Networks through these Processes may, at the Card Networks' sole discretion, be distributed to entities (such as card issuers) to partially—but not completely—compensate them for certain forms of financial losses due to the breach.  Recovery under the Recovery Process regulations at issue does not require a release of claims in any outstanding class litigation (such as that pending here).  Furthermore, there is no reason for Arby's to communicate with absent class members as part of the Recovery Processes.  Distributions of any benefits to Plaintiffs under the Recovery Processes are communicated and made by the card brands as part of their ordinary course of business under the Recovery Process regulations—not the merchant.

[2] *See, e.g.,* https://www.ropesgray.com/biographies/m/douglas-h-meal.aspx (describing Doug Meal as "the **lead outside lawyer** handling claims stemming from the data security breaches suffered by **Target**, . . . **The Home Depot**, **Arby's**") (emphasis added).

23).   Those Recovery Processes, which can provide *limited* compensation to financial institutions to *partially* compensate them for some of their losses related to a data breach, generally do not require participating financial institutions to release any of their claims in any pending litigation.   Coupling receipt of the benefits of the Recovery Processes with a general release that prohibits class members from participating in this case (as Ropes & Gray has attempted in other cases) is inherently coercive, misleading, and ripe for abuse, particularly when Class Counsel and the Court's typical oversight role under Rule 23 are completely shut out of the process. Moreover, if the past is any indication, Arby's settlement offers will likely be communicated by or in conjunction with Visa and MasterCard (who are in an ongoing business relationship with Plaintiffs), arise out of secret contracts negotiated between the Card Brands and Arby's, and fail to adequately disclose the nature of this case and underlying facts at issue (which Arby's will undoubtedly argue are confidential) so that the financial institutions will be unable to appropriately evaluate their claims against the risk of recovery.   If Arby's can commit that it will not attempt, either directly or through the Card Brands, an extra-judicial class action settlement without the involvement of the Court and Class Counsel, then Plaintiffs may agree that no order prohibiting communication with class members is necessary. Arby's has refused to provide such a commitment, however, when directly asked by

7

Counsel, which only further shows the apporiatness of an Plaintiffs' Proposed Order here. *See* Exhibit 1, at 7.

*Second,* even if Arby's informs class members about this lawsuit and their legal rights (as class members have a need for such information to evaluate any settlement offers), any such information would be through its own biased filter. Notwithstanding Arby's inherent self-interest, which completely undercuts its ability to provide information to class members in an even-handed way, Arby's position allows for no meaningful mechanism for this Court or Class Counsel to police the accuracy of what Arby's will tell class members *prior* to such communications being made. If Plaintiffs are forced to go to the Court only after Arby's communications have been distributed to unrepresented class members, it will likely be too little, too late. If the communications are in fact inaccurate, coercive, or misleading (as Ropes & Gray's similarly directed communications have been in the past), the irreparable harm will have already occurred, and an effective cure (if any) will be difficult to achieve, expensive to both parties, and mire the Court in unnecessary litigation.

*Finally*, Plaintiffs do not seek a blanket prohibition on all communications with absent class members. Nor do Plaintiffs seek to prevent Arby's from ever settling with individual class members. Instead, Plaintiffs request only that the Court

8

enter a *limited* order requiring that if Arby's, on its own or through the Card Brands or processors, intends to solicit wholesale releases from class members prior to class certification (when it has thus far refused to disclaim any intent to do so), Arby's must submit any communications about such offers to the Plaintiffs and Court in advance, allowing the parties to meet and confer and, if necessary, giving Plaintiffs an opportunity to object and raise any issues with the Court.  Plaintiffs' narrowly tailored proposed order is appropriate, supported by legal precedent, and properly balances the interests of all involved.  Through this process, if Class Counsel believe any part of Arby's proposed communication is misleading or inaccurate, they can attempt to resolve those issues before such communications occur rather than seeking a corrective communication or invalidation of releases after the communication has occurred.  Such an order will not affect Arby's business operations, hinder its negotiations with the Card Brands, prevent distribution of any payments Arby's ultimately agrees to make, disrupt the First Amendment, or otherwise interfere in any way with the Recovery Processes except to ensure that they are handled fairly and accurately and in accordance with Rule 23.

## I.     Ropes and Gray's History of Attempting to Use Recovery Processes to Release Class Claims

### A.     Target

Ropes and Gray, and, in particular, Doug Meal, were lead counsel for the Defendant in the *Target Data Breach Litigation*.[3]  In that litigation, financial institutions sued Target for damages suffered as a result of a massive data breach at that retailer in late 2013.  *See generally id.*, Dkt. No. 163.

In April 2015, Target and MasterCard reached a settlement under MasterCard's Recovery Processes requiring Target to pay up to $19 million to MasterCard for disbursement to card-issuing financial institutions.  *Id.*, Dkt. No. 390-1; Dkt. No. 390-3.  That agreement, which was made without court-appointed class counsel and without court oversight and approval, included MasterCard communicating with putative class members on Target's behalf and specifically representing that the settlement provided 71.4 percent of their losses.  *Id.*, Dkt. No. 390-3.  Not only was this figure inaccurate and misleading (*see id.*, Dkt. No. 389 at 6–8), it failed to adequately explain that acceptance of the offer would require a release of the class claims pending in the federal litigation—something that was not contemplated in MasterCard's own Card Operating Regulations.  *See generally id.*,

---

[3] Notably, many of the Plaintiffs' counsel here were lead counsel for the class in that litigation, as well.

Dkt. No. 389-2 at 5-1 (describing rights and obligations between MasterCard and issuing banks without any reference to participation contingent upon releasing entity responsible for breach); *see also Pa. State Employees Credit Union v. Fifth Third Bank*, No. 1:CV-04-1554, 2006 WL 1724574, at *6 (M.D. Pa. Jun. 16, 2006) (noting that the VISA recovery process does not "eliminate a member's right to pursue other legal remedies that may be available outside the Visa compliance system, for example a fraud or negligence claim").

In many cases, the settlement offers were not even made directly to the affected financial institutions.  Instead, the offers were made to third-party processors with whom the financial institutions were affiliated and which asserted the right to accept the offers without the approval or consent of the affected financial institutions.  Ultimately, the settlement failed because less than the requisite number of financial institutions agreed to participate. Notwithstanding that initial failed effort, in August 2015, Target reached a separate settlement with Visa, in which it again sent class members problematic communications and attempted to obtain releases of the pending class action claims through Visa's Global Account Compromise Recovery ("GCAR") process.

Thus, in the *Target Data Breach Litigation*, under Ropes & Gray's representation, Target sent mass communications that offered class members

payments in exchange for a release of their claims against Target, without involvement of the court or court-appointed class counsel and without adequately disclosing: (a) details about the pending class action litigation; (b) the potential consequences of releasing class action claims; or (c) that a release was not required by the Card Operating Regulations.

Class Counsel challenged Target's attempt to subvert the class action settlement process. The court found that the terms of the proposed MasterCard card brand recovery settlement in that case did "not appear altogether fair or reasonable." *Target Data Breach Litigation*, Dkt. No. 414 at 3. The court ultimately declined to enjoin the MasterCard settlement, however, finding a lack of evidence in the record at that time that class members believed they were misled or coerced into releasing their rights. *See Target Data Breach Litigation*, Dkt. No. 414 at 3. Before plaintiffs could supplement the record, however, the case settled.[4]

### B.   Home Depot's Attempts to Emulate Target

Not long after the Target data breach, the retailer Home Depot experienced a similar, massive data breach in 2014. Financial institutions ("HD FI plaintiffs") sued

---

[4] Notably, in the Home Depot data breach litigation in this Court (where Ropes & Gray also represented Home Depot with regard to the Recovery Processes, as discussed *supra*), the plaintiffs did provide class member declarations and Judge Thrash reached a different result.

Home Depot and their cases were consolidated in this Court, in the *Home Depot Data Breach Litigation*, and the MDL was assigned to Chief Judge Thrash.  Again, Home Depot, through Doug Meal and Ropes & Gray (Alston & Bird was trial counsel), pursued an extrajudicial settlement strategy that was similar to that Ropes & Gray used in *Target*, and attempted to use the Recovery Processes to facilitate a class-wide solicitation of releases of the claims pending in the MDL.  This campaign featured short response deadlines, confusing representations as to the issuers' best case recovery scenario, and an inherently misleading conflation of the Recovery Process with solicitation of releases of the MDL claims.

Initially, in accordance with Local Rule 23.1(C)(2), the parties conferred at the outset of the HD litigation and informed the Court that no specific order was necessary regarding communications with absent class members.  However, in November 2015, while its motion to dismiss was pending, Home Depot moved for leave to communicate with absent class members about settling their claims. Home Depot's intention was to solicit releases from HD FI plaintiffs without any direct participation or input from HD FI plaintiffs' counsel.  Unbeknownst to the HD FI plaintiffs' counsel and without mentioning what it was doing in the motion, however, Home Depot already had been communicating with absent class members about settlement for several months.  The day before Thanksgiving in 2015, the

13

HD FI plaintiffs' counsel were told by several class representatives that they were offered payments from MasterCard in exchange for a release of their MDL claims, and were given only a few days to make a decision.  Plaintiffs immediately sought to enjoin the communications and  sought to invalidate any releases Home Depot obtained.  Several HD FI plaintiffs submitted declarations indicating that their claims had been purportedly released by an intermediary entity (serving as a "sponsoring entity") despite the fact that the plaintiff itself, let alone its counsel, had had no notice of the offer or its terms and they were confused about this process.

During a hearing on this issue, Chief Judge Thrash commented: "[I]t's ***clearly coercive*** in giving people two days to either accept or reject or opt in or opt out … over the Thanksgiving holidays."; and "[I]t's clear to me that the communications that [Home Depot] attached to [its] papers are ***misleading and coercive*** in not giving [HD FI plaintiffs] the information they would need to make a decision about whether or not to release their claims against Home Depot."  Exhibit 2, *Home Depot*, 12/14/15 Tr. 60:14-19 (emphasis added).  Chief Judge Thrash authorized discovery regarding the settlement communications and indicated a willingness to entertain a later motion from the HD FI plaintiffs for further relief, including invalidation of the releases obtained through Home Depot's deceptive communications scheme (orchestrated by Ropes & Gray).  *Id.* 59:18-24; Dkt. 153 (granting FI Plaintiffs'

request for discovery on communications to unnamed class members).

The subsequent discovery process, spanning several months, included written discovery and/or depositions from both MasterCard and Visa, Home Depot, Ropes & Gray, and several card payment processors and cost the parties hundreds of thousands of dollars in attorney time alone.  Discovery revealed that Home Depot, with Doug Meal's guidance, had embarked on an effort to obtain releases from class members in late summer or early fall, 2015, principally by taking advantage of the Recovery Processes provided by MasterCard and Visa.  Home Depot sought to settle with financial institutions by offering issuers a small premium over the amount they would otherwise receive in the Recovery Processes in exchange for a release of their legal claims in the MDL litigation.

Home Depot's offers were made in two phases.  In Phase I, which began in late September or early October, 2015, Home Depot negotiated releases directly with the nation's largest payment card issuers, which in many cases also released the claims of smaller issuers that they sponsored.  In Phase II, which began in January, 2016, Home Depot extended offers to smaller issuers.  Separately, Home Depot negotiated settlements with American Express and Discover, which as independent entities do not participate in the MasterCard and Visa Recovery Processes.

Through Home Depot's attempted extrajudicial settlement tactics, the claims of HD FI plaintiffs representing roughly 70 to 80 percent of the payment cards compromised in the data breach were ostensibly "released" in the Recovery Processes. These releases were obtained without Court supervision under Rule 23 and without input from HD FI plaintiffs' counsel. Ultimately, Home Depot paid out approximately $14.5 million in premiums to MasterCard and Visa issuers in exchange for the releases of pending MDL claims that it obtained.

Combining the $14.5 million paid to obtain MDL releases and the amounts paid under the Recovery Processes generally, Home Depot paid approximately $140 million to the HD FI plaintiffs in extrajudicial processes. Plaintiffs were in the process of challenging those releases when they eventually negotiated a settlement agreement with Home Depot that provided an additional $25 million to issuers that had not released their claims in the Recovery Processes and an additional payment of $2.25 million to MasterCard issuers whose claims had been forcibly released by a payment card processor. This superfluous discovery and endless litigation could likely have been avoided had Home Depot approached the Court and Counsel in the first instance to ensure that its communications were not misleading and deceptive (as the Court suggested they were).

16

## II.    Legal Standard

Federal district courts are empowered to monitor, limit, or require the preapproval of communications between parties or their agents and members of a putative class or collective action.  Rule 23(d) of the Federal Rules of Civil Procedure authorizes courts to issue orders that, in the interest of "protect[ing] class members and fairly conduct[ing] the action," require notice to class members of "any step in the action"; that "impose conditions on the representative parties or on intervenors"; or that "deal with similar procedural matters."  Fed. R. Civ. P. 23(d)(1)(B), (C), & (E).

This authority is further clarified in this Court's local rules, which recognize that:

> In class actions where a putative class member is permitted to elect not to participate in the class action, there is an inherent risk that a class member's decision may, in the absence of court regulation of communications regarding the class action, not be based on a complete and balanced presentation of the relevant facts. *Special management of class actions is often necessary to protect the interests of both formal parties and absent class members.*

L.R. 23.1(C)(1) (emphasis added).  The local rules further prohibit communications with prospective or actual class members that "tend[] to misrepresent the status, purpose, and effects of the action or of any actual or potential court orders therein." L.R. 23.1(C)(3)(b).  The local rules also grant the Court authority to issue a more

specific order limiting communications when, "[b]ased on the record before the court," the court makes "a finding that a failure to so limit communications would likely result in imminent and irreparable injury to one of the parties."  L.R. 23.1(C)(2).

The authority to regulate communications to absent class members is also recognized in the analogous context of collective actions brought under the Fair Labor Standards Act and the Age Discrimination in Employment Act.  For example, in *Hoffmann-La Roche Inc., v. Sperling et al.*, 493 U.S. 165 (1989), the Supreme Court held that in order to further the objectives of the collective action process established by 29 U.S.C. 216(b), courts are permitted to authorize and facilitate the distribution of notice to putative collective action members which informs them of the existence of the action and their option to participate.  *Id.* at 169–72.  The court explained the benefits of early court involvement as follows:

> Because trial court involvement in the notice process is inevitable in cases with numerous plaintiffs where written consent is required by statute, it lies within the discretion of a district court to begin its involvement early, at the point of the initial notice, rather than at some later time.
> . . .
> By monitoring preparation and distribution of the notice, a court can ensure that it is timely, accurate, and informative. ***Both the parties and the court benefit from settling disputes about the content of the notice before it is distributed.***

*Id.* at 171–72 (emphasis added); *see also Maddox v. Knowledge Learning Corp.*, 499 F. Supp. 2d 1338, 1344 (N.D. Ga. 2007) (holding that it is within the court's discretion to prohibit or modify pre-certification statements which are "factually inaccurate, unbalanced, or misleading").

Echoing this point, the Eleventh Circuit in *Kleiner v. First National Bank*, 751 F.2d 1193 (11th Cir. 1985), reasoned that the interests of justice are best protected when the court monitors communications *before* they happen, rather than forcing the court to take corrective action after the fact:

> In this case, the carefully constructed edifice of check and countercheck, notice and reply, was obliterated when the telephones were lifted from their cradles. The Bank's actions obstructed the district court in the discharge of its duty to 'protect both the absent class and the integrity of the judicial process by monitoring the actions before it.' The Bank's subterfuge and subversion constituted an intolerable affront to the authority of the district court to police class member contacts.

*Id.* at 1203 (citations omitted) (quoting *Deposit Guaranty National Bank v. Roper*, 445 U.S. 326, 331 (1980)).

In granting protective orders that limit class communications, courts should ensure that limitations are "carefully drawn" to avoid infringing on a party's First Amendment rights. *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 (1981). To meet this standard, protective orders should be appropriately justified and narrowly

19

tailored: "In general, an order limiting communications regarding ongoing litigation between a class and class opponents will satisfy first amendment concerns if it is grounded in good cause and issued with a 'heightened sensitivity' for first amendment concerns." *Kleiner*, 751 F.2d at 1205; *see also Abdallah v. Coca-Cola Co.*, 186 F.R.D. 672, 675 (N.D. Ga. 1999) ("[T]he Supreme Court and the Fifth Circuit opinions in *Gulf Oil* make it exceedingly clear that district courts may enter an order prohibiting class communications that will likely cause imminent and irreparable injury to one of the parties.")

Whether good cause to enter such an order exists is determined by reference to four factors: "[1] the severity and the likelihood of the perceived harm; [2] the precision with which the order is drawn; [3] the availability of a less onerous alternative; and [4] the duration of the order." *Kleiner*, 751 F.2d at 1206 (citing *United States Postal Service v. Athena Products, Ltd.*, 654 F.2d 362, 367–68 (5th Cir. Unit B 1981)). In evaluating orders restricting communications with class members, courts have focused on two kinds of proof:

> First, the movant must show that a particular form of communication has occurred or is threatened to occur. Second, the movant must show that the particular form of communication at issue is abusive in that it threatens the proper functioning of the litigation. Abusive practices that have been considered sufficient to warrant a protective order include communications that coerce prospective class members into excluding themselves from the

> litigation; communications that contain false, misleading or confusing statements; and communications that undermine cooperation with or confidence in class counsel. Restrictions on the communication of settlement offers are subject to the same proof requirements.

*Cox Nuclear Med. v. Gold Cup Coffee Services, Inc.*, 214 F.R.D. 696, 697–98 (S.D. Ala. 2003) (citing *Bublitz v. E.I. duPont de Nemours & Co.*, 196 F.R.D. 545, 548 (S.D.Iowa 2000)).

The Eleventh Circuit has also noted that there is a heightened concern when, as in this case, the parties are involved in an ongoing business relationship: "A unilateral communications scheme, moreover, is rife with potential for coercion. '[I]f the class and the class opponent are involved in an ongoing business relationship, communications from the class opponent to the class may be coercive.'" *Kleiner*, 751 F.2d at 1202 (quoting Note, *Developments in the Law— Class Actions*, 89 Harv. L. Rev. 1318, 1600 (1976)); *see also Ojeda-Sanchez v. Bland Farms*, 600 F. Supp. 2d 1373, 1379–80 (S.D. Ga. 2009).

## III.  Argument

This Court should enter Plaintiffs' order regarding class communications, in the form attached hereto as Exhibit 3, because it is both necessary and narrowly tailored to regulate only a specific type of communication that is imminent and could cause irreparable harm if inaccurate or misleading.

Without prior review and authorization from this Court, based on Ropes & Gray's prior conduct and the previous findings from the courts in the *Target* and *Home Depot* litigation, it is likely that any communications sent to putative class members regarding the Recovery Processes (either from Arby's itself, or via the Card Networks working in conjunction with and as an agent of Arby's) will give class members the impression that the Recovery Process is the only appropriate venue for resolving their claims against Arby's, otherwise disparage the value of the judicial process, and/or minimize the results that may be achieved in court. Ropes & Gray has refused to agree that it will not seek these releases in this case. This sort of communication would constitute inappropriate interference with this litigation, and the Court should take steps to police it before it occurs. *See Belt v. Emcare, Inc.*, 299 F. Supp. 2d 664, 667 (E.D. Tex. 2003) (finding that the court could "limit communications with absent class members where the communications were . . . an improper attempt to undermine Rule 23 by encouraging class members not to join the suit"); *cf. In re Currency Conversation Fee Antitrust Litig.*, 224 F.R.D. 555 (S.D.N.Y. 2004) (finding that the court should "regulate communications that threaten the choice of remedies available to class members" and that the court's "supervisory authority over a defendant's communications with putative class members . . . is particularly apt where a defendant attempts to alter the contours of

22

the litigation or the availability of remedies."). To the extent Arby's claims it is not attempting to issue coercive or misleading statements or subvert the inherent class member protections in Rule 23, it should have no problem presenting its proposed communications first to the Court to allow time for the parties to meet and confer and to also give the Court the opportunity to resolve any disputes.

Misleading communications also present a clear danger of irreparable harm to potential plaintiffs, as the communication could mislead a plaintiff to forego participating in this lawsuit, assisting the class and plaintiffs generally, and potentially recover more complete relief (as plaintiffs in Target and Home Depot eventually did). Generally, Rule 23 protects against this sort of interference with class settlements by requiring notice and court approval so that class members receive complete and accurate information about a settlement offer negotiated by Class Counsel. Further, Rule 23 requires the Court to determine that any settlement is fair, reasonable and adequate to class members before it can be implemented. Here, Arby's would be attempting to subvert and circumvent these protections. Plaintiffs dispute that the damages they seek here substantially overlap with the amounts potentially recoverable under the Card Brand Recovery Processes and believe that any communications that seek a release from putative class members should be pre-approved by the Court to ensure that this hotly disputed litigation is

presented to class members in an accurate and balanced manner, particularly to the extent Arby's seeks releases from class members' processors as opposed to class members themselves, or seeks a release through Visa and MasterCard which have substantial economic power over class members who rely on them for credit card processing and could easily coerce class members into accepting an unfair proposal.

If a class member's participation in the Recovery Processes, which do *not* require release of class action claims, would result in the class member's exclusion from the class action without adequate and due notice, then this Court's authority to monitor communications about those Processes is particularly important.   *See Ojeda-Sanchez*, 600 F. Supp. 2d at 1380 (barring communication with potential plaintiffs after defendants "placed [potential plaintiffs] in a situation where they were required to distance themselves from the litigation"); *Longcrier v. HL-A Co.*, 595 F. Supp. 2d 1218, 1231 (S.D. Ala. 2008) (requiring defendants to provide potential class members full written disclosures before communicating with them, as the communication had the potential to persuade potential plaintiffs not to join the class due to incomplete information about the circumstances of the case).

While an order is necessary to avoid the likelihood of abuses to the class process, Plaintiffs' proposal is also narrowly tailored to ensure that Arby's and the

Card Networks' First Amendment rights are protected.[5]   The proposed order is not a broad prohibition on all communications, even though such order can be imposed in certain circumstances.  *See Pacheco v. Aldeeb*, No. 5:14-CV-121-DAE, 2015 WL 5125830, at \*4 (W.D. Tex. Sept. 1, 2015) ("[T]he Court finds good cause to enjoin Defendants from engaging in *any* ex parte communication with plaintiffs or class members regarding the subject matter of this action while the litigation is ongoing.") (emphasis added).

Plaintiffs' proposed order offers a reasonable compromise that prevents irreparable harm to potential class members.  The proposed order will allow Arby's and the Card Networks to communicate with class members regarding normal business activities, provided that they do not seek a release from class members and attempt to subvert the authority of this Court to supervise class settlements.  The proposed order is narrowly tailored to address only one type of communication:  an offer of settlement accompanied by a request for a release of claims in this litigation. Plaintiffs' proposed order, as a result, would have no effect on the Recovery Processes.  The problem arises only because Arby's has refused to agree it will not

---

[5]  The First Amendment does not protect misleading speech.  *E.g., Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980) ("For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading.").

seek to use the Recovery Processes to do something they were not designed to do—namely, to obtain releases from affected financial institutions through an unsupervised, pseudo-class settlement with complete disregard to the protections of Rule 23.

Additionally, the Plaintiffs' proposed order provides a mechanism whereby even communications which do request a release may still ultimately be sent, provided that the Court and Class Counsel are given an opportunity to ensure that the communication is not misleading. This protects the interests of all parties. If the communication is not misleading, then it will presumably be approved by the Court with no effect on the First Amendment rights of Arby's and the Card Networks.[6]

Dated: June 23, 2017                           Respectfully Submitted,

                                              */s/ Kenneth S. Canfield*
                                              Kenneth S. Canfield
                                              Ga. Bar No. 107744
                                              **DOFFERMYRE SHIELDS**

---

[6] Courts have imposed similar protective measures in the past. For instance, in *In re Municipal Securities Litigation*, No. 08 Civ. 2516 (S.D.N.Y. March 1, 2011) (attached as Exhibit 4), class counsel were concerned that a defendant was improperly communicating with potential plaintiffs regarding a settlement that could affect their pending claims. *Id.*, slip op. at 2. In response, the court ordered that the defendant get prior court approval communicating with potential plaintiffs regarding the settlement and that the parties first meet and confer regarding the language the defendant proposed to use. *Id.*, slip op. at 4. *Id.* In this way, the court was able to prevent disruptive communication with potential plaintiffs, but still allow settlement proceedings to move forward and avoid unduly restricting the defendant's First Amendment rights.

**CANFIELD & KNOWLES, LLC**
1355 Peachtree St., NE, Suite 1900
Atlanta, GA 30309
Telephone: 404.881.8900
Facsimile: 404.920.3246
kcanfield@dsckd.com

*Interim Liaison Counsel for Plaintiffs and the Class*

*/s/ Brian c. Gudmundson*
Brian C. Gudmundson
**ZIMMERMAN REED LLP**
1100 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Telephone: 612.341.0400
brian.gudmundson@zimmreed.com


*/s/ James J. Pizzirusso*
James J. Pizzirusso
**HAUSFLED LLP**
1700 K. Street, NW
Suite 650
Washington, DC 20006
Telephone: 202.540.7200
Facsimile: 202.540.7201
jpizzirusso@hausfeld.com

*/s/ Karen Hanson Riebel*
Karen Hanson Riebel
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Ave. S.
Suite 2200
Minneapolis, MN 55401
Telephone: 612.339.6900
Facsimile: 612.339.0981

27

khriebel@locklaw.com

*Interim Co-Lead Counsel for Plaintiffs and the Class*